IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEVI M. CHAVEZ

    Plaintiff,

vs.                                                                             Civ. No. 15-619 KG/KK

AARON JONES and
BOARD OF COUNTY COMMISSIONER
FOR VALENCIA COUNTY,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity (Motion for Summary Judgment), filed on December 22, 2016. (Doc. 35). Plaintiff filed a response, with supporting exhibits, on August 28, 2017. (Doc. 50). Defendants filed a reply on September 11, 2017. (Doc. 52). Having considered the Motion for Summary Judgment and the uncontested evidence, the Court will enter summary judgment in Defendants' favor on all claims.

*A. Background and Uncontested Facts[1]*

    *I. The Initial Investigation by Detective Jones*

Plaintiff Levi Chavez (hereafter, Chavez) and Defendant Aaron Jones (Jones) are former law enforcement officers. In this case, Chavez claims Jones wrongfully caused him to be prosecuted for the death of his wife, Tera Chavez (hereinafter, Tera). *See* Second Amended Complaint (Complaint), filed February 15, 2017. (Doc. 19). The investigation began on October 21, 2007, when Tera was found dead in her home with a gunshot wound to the mouth. (Doc. 50-

---

[1] The facts are taken from the uncontested portions of the summary judgment record, which was construed in the light most favorable to Plaintiff.

2) at 1-5.  Chavez dialed 911 and told the dispatcher he discovered Tera's body.  (Doc. 35-1) at 8.  He also told the dispatcher she had committed suicide.  *Id.*

Jones, then a detective with the Valencia County Sheriff's Department, was one of the first to respond.  (Doc. 50-2) at 1-5.  Chavez told police he had been away from the house because he and Tera were separated.  (Doc. 50-2) at 2.  At the time, Chavez was a police officer with the Albuquerque Police Department.  *Id.*  He stated: "I was on … duty … till midnight" and was otherwise "with [a woman] the whole … weekend."  (Doc. 50-2) at 2.  When Jones asked for her name, Chavez stated, "Debra.  She is a f**king freak."  *Id.*[2]

On November 27, 2007, Jones interviewed Debra Romero (Romero).  (Doc. 50-6) at 6.  Romero disclosed that Chavez was her boyfriend.  (Doc. 50-6) at 3-4.  She believed the relationship was going well.  *Id.*  Romero also disclosed that on the night of Tera's death, Romero had fallen asleep "[p]robably about 20 minutes before [Chavez] arrived" at her home.  (Doc. 50-6) at 6.  She estimated he arrived at "1 o'clock in the morning."  (Doc. 50-6) at 6.  In the interview, Jones reported Chavez referred to Romero as a "f**king freak" and that he obtained a new life insurance policy for Tera a month before she died.  (Doc. 50-6) at 6, 9.  Romero later testified she believed Jones.[3]  (Doc. 50-6) at 9.

Jones interviewed Rose Slama, another of Chavez's romantic partners, on November 6, 2007, and later, on November 21, 2007.  (Doc. 50-4) at 9.  Slama disclosed that there was a rumor "going around that [Chavez] was in the shower and he got out of the shower and that he

---

[2] Chavez argues Jones later lied about Chavez's use of the "f**king freak" comment.  (Doc. 50) at 4, 7.  However, the Court relies on the police interview transcript, which Chavez proffered as Exhibit 2 to his summary judgment response.  (Doc. 50-2) at 2.

[3] At trial, Romero also testified that she did not know when Chavez arrived at her house that night.  (Doc. 50-6) at 8.  When questioned further about her initial statement, she explained, "I think what I meant by that – like I said, I don't know what time he got there.  When I said 1 o'clock, I think I was just giving a range."  *Id.*

2

heard a pop." (Doc. 50-4) at 10. Otherwise, she maintained that she did not have any information about Tera's death. *Id*. During the interview, Jones informed Slama that Chavez had taken out an insurance policy a month before Tera died, adding, "The next thing you know, she was dead." (Doc. 50-4) at 4. Jones also stated Chavez had called another of his girlfriends a "f**king freak. (Doc. 50-4) at 6. He added, "You can imagine what he called you." *Id*. Jones further indicated Chavez had referred to Tera as a "worthless piece of skin" and lied during the 911 call. (Doc. 50-4) at 7-8. Finally, Jones indicated Slama, who was also married, "might come up on" any wiretap of Chavez's phones. (Doc. 50-4) at 8. Slama testified she believed Jones because he was a police officer. (Doc. 50-4) at 3.

As part of his investigation, Jones became aware of an alleged insurance fraud scheme involving Chavez's truck. (Doc. 50-5) at 4. Fraud investigator Richard Farrelly indicated that a woman telephoned the state insurance fraud bureau on October 15, 2007. (Doc. 35-6) at 2. She claimed to have information about a person who arranged to have a vehicle stolen.[4] *Id*. The telephone call was determined to have been made from the hair salon where Tera worked. *Id*. The caller identified herself as either "Tera Lucero" or "Sera Lucero." (Doc. 35-6) at 2. As a result of this information, Jones coordinated his investigation with Farrelly.[5]

Tera's death initially was determined to be a suicide. (Doc. 50-9) at 3. Thereafter, Jones provided the medical examiner additional information concerning "suspicions that she may not have shot herself … and … the potential criminal activities of [Chavez]…." *Id*. As a result, the

---

[4] Plaintiff has made no objection to consideration of hearsay statements. The Court will consider these statements for purposes of its summary judgment analysis, although it does not change the result in this case. *See Associated Press v. Cook*, 513 F.2d 1300, 1303 (10th Cir. 1975) (holding a party can waive admissibility objections in connection with summary judgment affidavits).

[5] The insurance fraud case was eventually closed due to the expiration of the statute of limitations. (Doc. 50-4) at 5. Aside from Tera's statements, Farrelly did not uncover any evidence that Chavez committed insurance fraud. (Doc. 50-5) at 6.

medical examiner, in consultation with forensic pathologists, revised the manner of Tera's death to "undetermined." *Id.*

According to Jones, the investigation stalled by 2008. (Doc. 50-7) at 4. Consequently, he recommended Tera's family "consider … filing some kind of lawsuit, up to, and including suing [him] if they had to to [sic] get information." *Id.* On August 18, 2008, Tera's family filed a wrongful death suit through counsel against Chavez and the City of Albuquerque in New Mexico's Second Judicial District Court, *The Estate of Tera Andrea Chavez v. Levi M. Chavez, II et al.,* case no. D-202-CV-2008-8659.[6] The central allegations were that the combined conduct of Chavez and the Albuquerque Police Department caused Tera's death. (Doc. 35-8) at 2. Chavez's counsel obtained recordings and/or transcripts of Jones' interviews with Slama and Romero no later than 2010.[7] Tera's estate settled its claims against the City for $230,000. (Doc. 35-8) at 2. The estate later agreed to dismiss its claims against Chavez, because: (1) he had no collectable assets; and (2) he agreed to place Tera's life insurance proceeds ($100,000) and the insurance proceeds from the truck ($7,861.24) in trust for the benefit of the children. (Doc. 35-8) at 3-4. Jones left the police force in October 15, 2010, to work for a private company. (Doc. 35-3) at 2.

---

[6] The Court takes judicial notice of the state court docket. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (courts have "discretion to take judicial notice of publicly-filed records ... and certain other courts concerning matters that bear directly upon the disposition of the case at hand"); *Stack v. McCotter,* 2003 WL 22422416 (10th Cir. 2003) (unpublished) (finding that a state district court's docket sheet was an official court record subject to judicial notice under Fed. R. Evid. 201).

[7] This date appears in Defendants' statement of undisputed facts. (Doc. 35) at 6. Although the supporting exhibit contains some evidence that counsel was in possession of some materials by 2010, but it does not conclusively establish the date. (Doc. 35-3) at 2. However, because Chavez failed to properly address the date and timeline in his response, the Court will "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

*II. The Independent Criminal Investigator*

On September 10, 2010, the Thirteenth Judicial District Attorney's office enlisted Agent James Mowduk of the New Mexico State Police to independently review the investigation into Tera's death. (Doc. 35-1) at 4. Mowduk was instructed to keep an open mind and to be as impartial as possible in determining whether the death resulted from a suicide or a homicide. *Id.*

Between September 10, 2010, and April 1, 2011, Mowduk reviewed the entire criminal case file and the discovery materials from the civil suit, including:

> [T]he initial 911 call by Levi Chavez, recorded interviews of Levi Chavez, recorded interviews with numerous witnesses, family members, friends, and co-workers of both Tera Chavez and Levi Chavez, crime scene photographs, [Office of Medical Examiner] photographs, Toxicology Reports, Crime Laboratory Reports, cellular telephone data and analysis, computer forensic analysis, civil depositions, information from Allstate Insurance Company, information from New Mexico National Guard, various financial, banking, and credit card information, medical history information, personnel and training records for Levi Chavez, time cards and work schedules for both Tera Chavez and Levi Chavez, as well as expert witness information and opinions.

(Doc. 35-2) at 3. His testimony regarding those materials is summarized below.[8] (Doc. 35-1).

   *1.     911 Call by Chavez*

Mowduk noted that when Chavez called, he stated his wife committed suicide. (Doc. 35-1) at 8. He asked four times when the responders would arrive but repeatedly refused the 911 operator's request to check for a pulse. (Doc. 35-1) at 9. When the 911 operator asked, "Well, why not?" he responded, "She's been dead for a day and a half." (Doc. 35-1) at 9.

---

[8] The summary is taken from Mowduk's sworn grand jury testimony. Chavez did not object to the use of the grand jury transcript, which essentially functions as an affidavit. *See, e.g., Arceo v. City of Junction City, Kansas,* 182 F.Supp.2d 1062, 1080 (D. Kan. 2002) (considering grand jury testimony in summary judgment proceeding because defendants "are in the same position they would have been had [plaintiff] filed an affidavit signed by the witness[]."); Advisory committee note to Fed. R. Civ. P. 56(c)(2) (A party must "object that the material cited … cannot be presented in a form that would admissible in evidence," which then shifts burden to "the proponent to show that the material is admissible"); *Khan v. New Frontier Media,* 2003 WL 22810447, * 3 (10th Cir. Nov. 26, 2003) (holding the Court can consider hearsay testimony on summary judgment if opposing party does not object).

## 2. *Crime Scene Photos*

Mowduk also described the crime scene photos. For example, he noted from the photos that Tera was lying on the bed in a peaceful position facing the television with pillows propped behind her and with her feet crossed. (Doc. 35-1) at 7. The photos reflect that Tera's cell phone was plugged in to charge on the opposite side of the bedroom. (Doc. 35-1) at 8.

Mowduk also testified about the gun and blood patterns. Specifically, there was a bullet casing under the gun and the magazine was unseated, which is inconsistent with a weapon that cycled and did not malfunction. (Doc. 35-1) at 7-8. The photos also indicated Tera appeared to have been holding a remote control in her dominant hand, which ended up on top of the gun. (Doc. 35-1) at 8. Mowduk also determined that the blood on the gun was inconsistent with the blood flow from the shooting. (Doc. 35-1) at 7-8. There was no blood spatter on Tera's hands, as would be expected. *Id.* There was, however, a swipe of blood on a portion of the bed that was out of Tera's reach and that was covered by the comforter and sheets. (Doc. 35-1) at 8.

Finally, Mowduk noted items in the photos suggesting Chavez was home on the night of Tera's death. (Doc. 35-1) at 11-12. For example, crime scene photos showed a towel draped over a chair near the bed, a single pair of shorts in the washing machine, and black flip flops near the bed. (Doc. 35-1) at 11. Mowduk also noted Slama told police that Chavez wore black flip flops and always threw his shorts in the washing machine and showered after sex. *Id.* Mowduk further noted that Chavez's police-issue bullet proof vest was hanging in a green armoire dresser. (Doc. 35-1) at 12. Similarly, the photos reflected that Chavez's police-issued duty weapon was used in connection with Tera's death. *Id.* Mowduk reported that Chavez was carrying a .38 caliber revolver - which is not a defensive weapon - when he was found at the crime scene. *Id.*

Chavez's only defensive-grade weapon (a Kimber) was locked in the trunk of his police cruiser. *Id.*

### 3. *Laptop and Cell Phone Analysis*

Mowduk reviewed the search history from the home laptop seized on the night of Tera's death. (Doc. 35-1) at 11. The forensic analysis revealed queries and websites about "how to kill someone" or "how to kill someone and get away with it." *Id.* Mowduk also reviewed Chavez's cell phone records and activity for the year of 2007. *Id.* He noted Chavez's last incoming text from Tera reads, "I'm afraid I am going to hurt myself, I am sooo upset, sad, and hurt." (Doc. 35-1) at 12; (Doc. 50-2) at 4. Based on Mowduk's review of Tera's known text messages, diary entries, and written correspondence, he noted Tera never used the term "sooo." (Doc. 35-1) at 12. Mowduk noted, however, that Chavez's known text messages and written correspondence frequently included the phrases "sooo sorry" and "sooo sad." *Id.* Mowduk finally noted that Chavez had turned off his cell phone for 15 hours on the date of Tera's death, which was the longest period his phone was off in 2007. *Id.*

### 4. *Interviews with Tera's Family and Friends*

Mowduk also reviewed the statements by Tera's family members, friends, and co-workers. He noted that several witnesses told police that Tera thought Chavez was going to kill her.[9] (Doc. 35-1) at 10. Tera's parents reported that Chavez arranged to send the children out of town so that the couple could spend the weekend together to discuss parenting plans. *Id.* Mowduk noted from receipts and credit statements that on the night Tera died, she had rented five movies. (Doc. 35-1) at 10.

### 5. *Chavez's Statements at the Scene*

---

[9] Plaintiff did not object to consideration of hearsay statements. *See* Supra, note 7; *Associated Press v. Cook*, 513 F.2d 1300, 1303 (10th Cir. 1975) (holding that a party can waive admissibility objections in connection with summary judgment affidavits).

Mowduk reviewed Chavez's statements at the scene. (Doc. 35-1) at 9. Mowduk noted that before police asked, Chavez indicated he was not home on the night of Tera's death because he and Tera were separated. *Id.* Mowduk further noted that Chavez showed officers Tera's last text message and then read it out loud. *Id.* According to Mowduk, Chavez stated Tera committed suicide with his service weapon. *Id.*

### III. The Criminal Proceedings

Mowduk met with members of the Thirteenth Judicial District Attorney's Office on two occasions in 2011 to discuss these findings, including whether criminal charges should be filed. (Doc. 35-2) at 3. Mowduk later stated he "definitely" recommended treating Tera's death as a homicide, and "the one and only suspect … [he] was able to locate was Levi Chavez." (Doc. 35-1) at 13. Mowduk's report reflects "it was determined and agreed" that Chavez should be charged with murder and tampering with evidence. (Doc. 35-2) at 3. The case was presented to a Grand Jury, which returned an indictment on April 7, 2011. *See State of New Mexico v. Levi M. Chavez*, case no. D-1314-CR-2011-125.

Chavez's criminal trial was held on June 10, 2013, through July 15, 2013. *See* Minute entries in case no. D-1314-CR-2011-125. As part of the case, Chavez's defense counsel received recordings and/or transcripts of Jones' interviews with Slama and Romero no later than June 13, 2013. (Doc. 35-10) at 2. Chavez was acquitted of all charges on July 18, 2013. *See* Verdicts entered in case no. D-1314-CR-2011-125.

### IV. The Federal Lawsuit

On February 15, 2016, Chavez filed his Second Amended Complaint (Complaint), asserting claims against Jones and the Board of County Commissioner for Valencia County for malicious prosecution, malicious abuse of process, defamation, and outrageous conduct. (Doc.

8

19). Chavez argues Jones fabricated the evidence that led to his prosecution. *Id.* Specifically, he argues Jones: (1) lied to Romero and Slama, which caused them to change their statements; (2) shared fabricated evidence with the Medical Investigator in an effort to change the manner of death; (3) inappropriately pursued the insurance fraud theory; and (4) convinced Tera's family to file a malicious civil suit. (Doc. 50).

On December 22, 2016, Defendants filed a motion for summary judgment on all claims. (Doc. 35). Defendants assert Jones is entitled to qualified immunity, arguing Jones did not cause the prosecution, and in any event, probable cause existed aside from his alleged misstatements. (Doc. 35) at 2-3. Defendants also argue there was no abuse of process, and the defamation claims are time-barred. *Id.*

Chavez failed to file a timely response. Instead, more than three months later, Chavez notified the Court of an agreed deadline for the response, May 16, 2017. (Doc. 39). Then, on May 15, 2017, Chavez filed a second notice of a new deadline, June 16, 2017. (Doc. 40). Chavez again failed to meet the deadline. Two weeks later, on June 28, 2017, Chavez filed motions seeking additional time to depose Mowduk pursuant to Fed. R. Civ. P. 56(d), or alternatively, leave to file a late response. (Doc. 41). The Court denied Chavez's Rule 56(d) request but granted leave to file a later response. (Doc. 51). Chavez filed his opposition response on August 28, 2017, withdrawing his claims for outrageous conduct, defamation based on statements to the press, and malicious prosecution under the Fifth Amendment. (Doc. 50) at 9.

The remaining claims include: (1) malicious prosecution under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments; (2) state law malicious abuse of process related to the criminal prosecution; (3) state law malicious abuse of process related to the wrongful death suit;

9

(4) state law defamation related to Jones' remarks to Romero and Slama; and (5) any vicarious liability on the part of the Board of County Commissioner for Valencia County.  (Doc. 50).

B. *Summary Judgment Standard*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).  The nonmovant may not rely upon mere allegations or denials contained in its pleadings or briefs and must instead show "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

C. *Discussion*

   1. *Renewed Rule 56(d) Request*

As an initial matter, Chavez again argues it is necessary to depose Mowduk to sufficiently respond to the motion for summary judgment.  (Doc. 50) at 3.  The Court conducted a hearing on the Rule 56(d) request on August 28, 2017.  (Doc. 49).  Chavez's counsel reported at the hearing that he originally decided not to depose Mowduk in connection with the summary judgment proceedings but then changed his mind.  (Doc. 49) at 2.  The Court denied the Rule 56(d) request to avoid further delay, noting the length of time the motion had been pending. *Id. see also Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1554 (10th Cir. 1993)

(District courts have discretion to deny dilatory Rule 56(d) requests). Chavez has not raised any new arguments or otherwise demonstrated grounds to revisit that ruling. Therefore, his renewed request to depose agent Mowduk is denied.

*2. Malicious Prosecution Under 42 U.S.C. § 1983*

Federal malicious prosecution claims are brought under 42 U.S.C. § 1983 and the Fourth Amendment. *See Margheim v. Buljko,* 855 F.3d 1077, 1085 (holding Fourth Amendment provides basis for asserting Section 1983 malicious prosecution claims). "A Section 1983 malicious prosecution claim includes five elements: (1) the defendant caused the plaintiff's … prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the … prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *M.G. v. Young,* 826 F.3d 1259, 1262 (10th Cir. 2016) (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Malicious prosecution claims against police officers typically are analyzed through the lens of qualified immunity. *See, e.g., Taylor v. Meacham,* 82 F.3d 1556, 1559 (10th Cir. 1996); *Margheim,* 855 F.3d at 1087; *D'Addabbo v. United States,* 2008 WL 5062181, * 2 (10th Cir. Dec. 2, 2008); *Valdez v. Derrick,* 681 Fed. App'x 700, 703 (10th Cir. 2017). Qualified immunity shields officers from an action for damages unless their conduct during the criminal investigation "was unreasonable in light of clearly established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "When a [Section 1983] defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Okla. ex. rel, Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). The Court must grant

judgment in the defendant's favor if the plaintiff fails to establish either prong of the two-part inquiry. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

In malicious prosecution cases, part one hinges on whether the five statutory elements are met, and in particular whether probable cause existed for the arrest or prosecution. *See Marghiem*, 855 F.3d at 1087 ("[Planitiff] is pursuing a malicious prosecution claim, and therefore, to satisfy the first part of his [qualified immunity] burden, he must show the five elements of his claim to establish a Fourth Amendment violation"); *Kerns v. Bader,* 663 F.3d 1173, 1187 (10th Cir. 2011) (stating probable cause determination was "easiest and most economical way" to resolve qualified immunity question). Defendants argue Chavez cannot meet elements one (causation) and three (probable cause). As discussed below, the Court agrees.[10]

### I. Causation

"The principal player in carrying out a prosecution ... is not police officer but prosecutor." *Taylor v. Meacham*, 82 F.3d 1556, 1563 n. 8 (10th Cir. 1996) (addressing causation element of Section 1983 malicious prosecution claim). "Accordingly, an officer typically does not proximately cause a malicious prosecution because the independent decisions of the prosecutor in bringing the charge and the court in issuing an indictment or warrant constitute superseding causes that break the chain of causation." *Calvert v. Ediger*, 415 Fed. App'x. 80, 83 (10th Cir. March 4, 2011) (citing *Taylor,* 82 F.3d at 1564). However, officers who misrepresent "material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, [and] trial court … all act independently to facilitate" the prosecution. *Pierce v. Gilchrist*, 359 F.3d 1279, 1289 (10th Cir. 2004). The

---

[10] The Court notes that Defendants waive any challenge to the remaining elements of the malicious prosecution claim. *See Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997) (noting parties waive any alternative theories not argued with "specificity" before trial court).

12

causation element can be met if the officer supplied misleading information that was "instrumental in the plaintiff's … prosecution." *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

Viewing the evidence in the light most favorable to Chavez, there is no indication that Jones misrepresented facts, or that any misrepresentations were instrumental to the prosecution. Indeed, the District Attorney sought to address any issues with the initial investigation by engaging Mowduk, an outside expert. Mowduk conducted an independent, unbiased review of the entire case file - which went well beyond any evidence allegedly tainted by Jones. The District Attorney analyzed the evidence and decided Chavez should be prosecuted. Jones retired from law enforcement approximately when Mowduk began his work and was not involved in those deliberations. Hence, Chavez has failed to establish the causation element of a malicious prosecution claim.

*II. Probable Cause*

Qualified immunity also bars a malicious prosecution claim when probable cause supported the criminal charges. *See Kerns v. Bader,* 663 F.3d 1173, 1187 (10th Cir. 2011) (noting plaintiff can defeat qualified immunity by establishing prosecution was without probable cause). Probable cause "does not require proof beyond reasonable doubt," nor does it "require the suspect's guilt to be more likely true than false." *Id.* at 1188. "Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime." *Id.* (internal quotations omitted).

Generally, "the return of an indictment by a grand jury is a conclusive determination of the issue of probable cause." *D'Addabbo v. United States*, 2008 WL 5062181, * 4 (10th Cir. 2008) (quoting *United States v. Nunez*, 668 F.2d 1116, 1125 (10th Cir. 1981)). Where, as here,

13

the plaintiff argues the charges and indictment resulted from fabricated evidence, "probable cause is determined by setting aside the false information and reviewing the remaining truthful facts." *Kerns v. Bader,* 663 F.3d at 1188. *See also Wolford v. Lasater*, 78 F.3d 484 (10th Cir.1996) (analyzing whether false grand jury testimony was material to probable cause determination).

Chavez argues he was charged and indicted because Jones lied to Romero and Slama. Chavez argues, for example, that he had a life insurance policy long before Tera's death and that he never called Tera a "worthless piece of skin." As noted above, the record does not establish Jones told any specific lie. However, assuming Jones did lie or exaggerate certain facts, the Court is not convinced his interrogation methods were unlawful. There is no indication that Jones coached the witnesses, coerced them to lie, or employed similar unsavory tactics. At most, the evidence suggests he maligned Chavez's character to elicit truthful information the witnesses were initially withholding. Such conduct does not amount to a constitutional violation. *See, e.g., Fields v. Wharrie,* 740 F.3d 1107, 1112 (7th Cir. 2014) (distinguishing instances where investigator fabricates evidence from instances where investigator "coerc[es] a reluctant witness to say what may be true").

Alternatively, assuming the evidence pertaining to Romero, Slama, and insurance issues is disregarded, the Court nevertheless finds the remaining undisputed evidence support a finding of probable cause. For example, the crime scene photos reflect several items inconsistent with a suicide, including: Tera's peaceful posture and crossed feet; the orientation of the gun and blood spatter; the smeared blood on a portion of the bed Tera could not reach; and evidence that Tera's phone was plugged in across the room. (Doc. 35-1) at 7-8, 11-12. The photos also reflect Chavez's police-issue bullet proof vest was at the scene, while his interview reflects he "was on

14

… duty … till midnight" and was otherwise "with [Romero] the whole … weekend." (Doc. 50-2) at 2; (Doc. 35-1) at 12.

Further, forensic analysis on the home computer reveal searches for "how to kill someone" or "how to kill someone and get away with it." (Doc. 35-1) at 11. The analysis of Chavez known communications reflect that Chavez frequently used the word "sooo," which appeared in Tera's purported suicide text. (Doc. 35-1) at 12. However, the analysis of Tera's known communications reflect she never used the term. *Id.* Finally, Tera's statements to her family members also support the finding of probable cause. Before her death, Tera stated that if anything happened to her, Chavez was responsible. (Doc. 35-1) at 10.

Significantly, none of this evidence has been challenged or traced to improper police work by Jones. *See Kerns,* 663 F.3d at 1188 (finding probable cause based on "what *was* included in the affidavit and *isn't* challenged by" plaintiff) (emphasis in original). Taken together, the evidence establishes probable cause to prosecute Chavez for Tera's death.

Moreover, the fact that a jury ultimately acquitted Chavez is not helpful to him here. *See Stone v. Powell,* 428 U.S. 465, 540 (1976) (noting that the fact of an acquittal does not establish a lack of probable cause). Having determined Chavez failed to demonstrate a constitutional violation, the Court need not reach whether the constitutional right was clearly established. Jones is entitled to qualified immunity on this claim.

### 3. *State Law Malicious Abuse of Process Claims*

Chavez also asserts state law claims against Jones for malicious prosecution and malicious abuse of process in connection with the criminal proceeding and the civil suit filed by Tera's family. In New Mexico, "malicious prosecution and abuse of process … [have been] restated as a single cause of action known as malicious abuse of process." *Benavidez v. Shutiva,*

2015-NMCA-065, ¶ 20, 350 P.3d 1234 (quoting *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 53, 124 N.M. 512, 953 P.2d 277, *overruled on other grounds by Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 204 P.3d 19). The tort encompasses claims based on civil and criminal process. *Id.*

To prevail on a malicious abuse of process claim, a plaintiff must demonstrate: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham*, 2009-NMSC-007, ¶ 29. "An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process." *Id.* (internal quotations omitted). In this context, "probable cause is the reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *Benavidez v. Shutiva,* 2015-NMCA-065, ¶ 20, 350 P.3d 1234 (quotations omitted). Because malicious abuse of process claims are construed narrowly to protect the right of access to the courts, "the lack of probable cause must be manifest." *DeVaney,* 1998-NMSC-001, ¶ 22.

If the Court determines probable cause supported the criminal charges or civil suit, the claim will be dismissed unless the plaintiff can show: "(1) … a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) … the wrongful use of proceedings, such as an extortion attempt." *Durham,* 2009-NMSC-007, ¶ 29. Examples include "using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it[;]" "excessive execution on a judgment; attachment on property other than that involved in the litigation or in an excessive

16

amount; oppressive conduct in connection with the arrest of a person or the seizure of property, such as illegal detention and conversion of personal property pending suit; [and] extortion of excessive sums of money." *DeVaney,* 1998-NMSC-001, ¶ 28.

### I. The Criminal Proceeding

As discussed above, probable cause existed for Chavez's prosecution. *See Banos v. State, New Mexico State Police,* 2012 WL 868876, * 3 (N.M. App. Feb. 8, 2012) (discussing "common element" of probable cause under state and federal law). There is also no evidence that Jones misused procedural devices. Further, as noted above, Chavez presents no evidence that any claimed impropriety caused the alleged harm, *i.e.,* the prosecution. *See Rice v. Wright,* 2013 WL 4534807, *1 (N.M. App. May 14, 2013) (holding "the claimed procedural irregularity with respect to the initial [criminal] complaint did not lead to any damages, which is an element of a malicious abuse of process claim"). Chavez therefore cannot maintain a state law malicious abuse of process claim based on his criminal prosecution.

### II. The Civil Proceeding

Chavez also seeks to hold Jones liable for the wrongful death suit filed by Tera's family. Jones recommended that the family file a civil lawsuit to obtain more information about Tera's death. Under New Mexico law, a party does not have to actually initiate the lawsuit to be liable for abuse of process. *Durham,* 2009-NMSC-007, ¶ 29. *Durham* recognized that certain abuses, such as improper use of discovery and subpoenas, could occur after another party initiated the action. *Id.* at ¶ 29. However, to establish liability, a plaintiff must show that the defendant "*use[d] … process in a judicial proceeding.*" *Id.* at ¶ 29 (emphasis added). Chavez has not cited, nor has the Court found, any authority suggesting that a non-attorney individual "uses

17

process in a judicial proceeding" by merely describing the benefits of a civil suit to the eventual plaintiff.

Moreover, Chavez has not brought forward evidence of any irregularity or impropriety in the civil suit, nor has he demonstrated a lack of probable cause. The New Mexico Supreme Court has recognized the favorable-termination defense to abuse of process claims, meaning that "some form of recovery for the original-proceeding plaintiff is conclusive evidence of the existence of probable cause." *DeVaney,* 1998-NMSC-001, ¶ 23 (quotations omitted). The favorable-termination defense does not involve "a claim-by-claim inquiry." *Fleetwood Retail Corp. of N.M. v. LeDoux,* 2007-NMSC-047, 142 N.M. 150, 164 P.3d 31. "Rather, it is determined as to the lawsuit in its entirety, and any recovery by the original plaintiff will be an absolute defense to a malicious abuse of process claim founded on lack of probable cause." *Id.*

Under this analysis, the Court notes that Tera's estate settled its lawsuit with the City for $230,000. The Court also notes that Chavez agreed to place $107,861.24 in insurance proceeds (which includes proceeds from his own truck) in trust for the benefit of the children. Jones therefore did not abuse any process in connection with the civil suit.[11]

*4. State Law Defamation Claims*

Finally, Chavez seeks to sue Jones for defamation in connection with the alleged misstatements to Romero and Slama. He asserts Jones statements - including those relating to "f**king freak," alleged derogatory comments about Tera, and about insurance fraud - undermined his reputation with the women and, in particular, their willingness to help him in the criminal investigation.

---

[11] The state law malicious abuse of process claims may also be time-barred under NMSA 1978, § 41-4-15(A), which provides a two-year statute of limitations for tort actions against public officials. However, the record does not establish when Chavez learned about the alleged wrongful conduct underpinning such claims.

The conduct occurred while Jones was a public official. Therefore, the New Mexico Tort Claims Act (TCA) applies to the defamation claims. *See Benavidez v. Shutiva,* 2015-NMCA-065, 350 P.3d 1234 (applying TCA to state-law claims against police officers stemming from criminal prosecution); *Niederstadt v. Town of Carrizozo,* 2008-NMCA-053, ¶ 13, 143 N.M. 786, 182 P.3d 769 (same). The statute of limitations under the TCA is two years after "the date of the occurrence resulting in loss, injury or death." NMSA 1978, § 41-4-15(A).[12] The "statute of limitations begins to run when a plaintiff knows or with reasonable diligence should have known of the injury and its cause, even if the claimant is not aware of the full extent of the injury." *Scott v. Dona Ana County,* 2013 WL 4516379, * 3 (N.M. App. June 12, 2013) (addressing TCA and citing *Maestas v. Zager*, 2007-NMSC-003, ¶ 22, 141 N.M. 154, 152 P.3d 141).

The undisputed facts show that Jones made his statements in 2007 or 2008. It is also undisputed that Chavez, through counsel, received a copy of the interview transcripts in 2010 and again on or before June 13, 2013. Chavez brought this action more than two years later, on July 15, 2015. Therefore, any defamation claims are time-barred.

*D. Conclusion*

Viewing the evidence in the light most favorable to Chavez, the Court will grant summary judgment in Jones' favor on all outstanding claims.

IT IS ORDERED that

1. Plaintiff's renewed request to conduct additional discovery pursuant to Fed. R. Civ. P. 56(d) is denied;

2. Defendant Jones' Motion for Summary Judgment (Doc. 35) is granted, and judgment will be entered.

---

[12] Section 41-4-15(A) was held unconstitutional as applied to minors, which has no bearing on this case. *See Jaramillo v. Heaton,* 2004-NMCA-123, ¶ 4, 136 N.M. 498, 100 P.3d 204.

19

_____
UNITED STATES DISTRICT JUDGE